Good morning. My name is Craig Spiegel. I'm appearing on behalf of the plaintiffs and appellants. My intention and hope is to save approximately two to three minutes for rebuttal argument. This is a case by two appraiser appraisal companies claiming that they were denied the common law duty of fair procedures when they were removed from a list of approved appraisers kept by defendants Wells Fargo and Rells. I'd like to begin by discussing the impact of such a decision. This was not a case in which Wells Fargo or Rells simply said, you know, we're not going to hire you, but God bless you, go out and get work wherever you can. The effect of removing these appraisal companies from the approved list was that Wells Fargo would not consider any appraisal from such a company, whether it was ordered by Wells Fargo or ordered by somebody else. That means that others in the community, brokers, mortgage brokers and the like, would have a very strong incentive not to ever hire that appraiser because they knew that at some point they might end up with Wells Fargo. If they were working with Wells Fargo. Correct. If they were working with Bank of America or WAMU or somebody else, we don't have, there's no evidence that Wells Fargo was controlling any of their decisions about which appraisals to use. Agreed. But the point is lots of times ahead of time, a broker doesn't know what bank might be the lender. Brokers all the time will go to various banks. And so they would have a very strong incentive not to use. Under the California Common Law duty of fair play, does Wells Fargo have to take all comers in as appraisers? No. This is a case of. But once they put them on the list, then they can't take them off without triggering some kind of obligation? Without some kind of fair procedure. That's correct, Your Honor. The courts have held, Your Honor, just for example as in the Palm Medical case or in Pot Fan, that an insurer that has a preferred, a PPN, a Preferred Physician Network, doesn't have a duty to put every physician on the network, but the courts have held that once they're on that network, there has to be some fair procedure. Can you tell me where in the complaint the statements that you just made appear, i.e., with regard to the impact of Wells Fargo's decision? In the complaint, Your Honor? Yes.  I'm sorry, I don't have it at my fingertips, but I will find it. It's not a long complaint. I apologize. And in the end, it seems that what you haven't alleged with regard to, first of all, as I understand it, appraisers are only licensed in certain States. Correct. And these appraisers, one operates in what, in Oregon and one in Washington? Washington and Colorado. Okay. There's also a choice of law problem, which we can get to, but let's leave that alone for now. And there's no allegation in this complaint from which one could say anything sensible about the actual impact of this behavior on the ability to operate in the States in which they're operating. There's no sense of, first of all, how predominant Wells Fargo and the other defendant are in those States as opposed to nationally, and there's no sense of what percentage of the overall business is being deprived. I understand there is. The only thing that's in the complaint is some notion that they lost the business because from one year to the next, and there's some discussion about whether that really shows that or not. But as to their ability to operate as appraisers in that State after losing the Wells Fargo business, there's just, there's basically nothing. I would disagree, Your Honor. They lost 20 to 30 percent of their business. Okay. But they could have gone the next day and gotten it from somebody else as far as the complaint shows. I'm sorry? As far as the complaint shows, they could have gone the next day and gotten it from somebody else. But they didn't. They've lost that substantial business. And we don't know what 20 to 30 percent of what. We don't know what we don't know. I mean, if they happen to have concentrated their work on Wells Fargo business, but in fact Wells Fargo is 5 percent of the mortgage industry in that State and there's 95 percent, which they haven't even looked at, then what's their problem? Well, let me back up for one minute because this claim was alleged in the first amended complaint. And the district court didn't dismiss the case just because there wasn't enough allegations about the market power in that State. The court said, look, this is, they just decided not to do business with this defendant. Well, are you saying that you should have had another opportunity to amend the complaint and would you like us to give you that? If that is the issue, yes. If this Court does not agree with the district court, which, as I read the opinion, said, look, this is the type of situation in which fair procedure applies at all, so there's no reason to amend. But if this Court thinks that the problem is that we didn't amend and we didn't allege enough about specific power of Wells Fargo in specific communities, we'd be happy to do that and we could and would do that. Do you agree that in your present complaint that there are no real substantive allegations as to the power of the defendants in the geographical issues, geographical areas where the two plaintiffs do their work? I don't, Your Honor. I think under Rule 8, between the power of Wells Fargo as the number one or number two mortgage lender. Nationally. Nationally. Yes, understood. And the amounts lost by these plaintiffs, that there is enough or reasonable inference that there is the power here. Uh-huh. And if we disagree with you? Then I would ask the Court if that's the basis, if the Court, that that is the prime reason for holding that we have an alleged acclaim, yes, we do think we should be able to let. Even if Wells Fargo is the largest mortgage lender nationally, that doesn't tell us whether it has 5 percent or 80 percent of the market. I understand. And so if you're, if the Court. Even nationally, it doesn't tell us that. Yes. But if the Court believes we didn't allege enough facts, we never were given a chance. We were never told by the Court, this is where I think you're short. Oh, wait a minute. Not given a chance. It's up to you to make the decision based upon the law of what's required. And what we're pointing out is that there must be some indication of market power, so there's almost a gatekeeper process involved. And I agree with Judge Berzhon. I don't see where that's in the complaint. And I think you agree with that, that it's not in the complaint. The specifics as to the specific states, no, it's not. The specific areas where the plaintiffs work. Yes. But please understand, again, I want to make sure that I'm clear, that this was alleged in one complaint. It was dismissed with prejudice without any opportunity to allow us to amend. The Court simply said. I'm sorry? I thought there was at least one amendment. There was an initial complaint that did not include this claim. The Court dismissed that. We agreed with the Court's reasoning in that, so we did not reallege those causes of action. This cause of action was alleged only in the First Amendment complaint. And the reason we didn't bother to go in and say, look, Your Honor, we know you dismissed with prejudice, but we would like to present an amended complaint, is the reading of the district court decision made it clear to us. The Court was like, I don't even care if you allege that, because this is a decision by a bank not to do business, and that's just not subject to the duty. What's the difference between your clients losing Wells Fargo's business and, let's say, Xerox losing Wells Fargo's business for the copy machines? So the Xerox in the bank says, look, this is terrible, but we just lost all of Wells Fargo's business in San Francisco. And this is a significant bank, and we can't afford to lose this business to whoever, IBM or whatever the copy machine is. A prime distinction is that the California legislature has determined that interference with appraisal independence is very much against the public interest. And if I could, if you bear with me. I'm sorry. The California legislature has made that determination? Yes. In 2007, the legislature adopted section 10901090.5 of the California Civil Code, and it's cited in our briefs. The statute, at the time it was enacted, said, quote, no person with an interest in a real estate transaction involving an appraisal shall improperly influence or attempt to improperly influence, through coercion, extortion or bribery, the development Is that a criminal statute? No. It is not. It's a civil code. You can bring a tort action in it? No, we're not. Who enforces it? I'm citing this. The State does. We're not, I'm not, I want to make clear, what I'm citing this for is the public interest portion of the duty of fair procedures. And here's the key. The legislature deemed this statute so important that it enacted it immediately. And in doing so, in the enabling legislation, 2007, CalSTATS Chapter 291, Section 4, the California legislature said this. This Act is an urgency statute necessary for the immediate preservation of the public peace, health or safety within the meaning of Article IV of the Constitution. That's language that's usually used to justify either a criminal statute or a heavy regulatory statute. Now, you've got, you don't have a private cause of action under this statute,  do you? No. But I'm citing this for the public interest. The court, the legislature went on to say the facts constituting the necessity are, in order to take immediate steps to bring credibility to mortgage lending in California and to protect consumers and other participants in mortgage transactions from fraudulent and deceitful practices, it is necessary that this Act take effect immediately. And it's a civil code. It's a civil Act. The hypothetical you posed to me, Your Honor, doesn't have that type of public interest involved. There's nothing that can be cited along the lines. There's another point. Wells Fargo. Well, the California, in the other California fair-dealing cases, we don't always have a statute akin to the one that you've described here. So if you could deal with my question directly, why isn't that a fair-dealing case if Wells Fargo decides not to deal with Xerox? Well, first, I mean, in many of the cases, most of them, in fact, the Supreme Court did cite to legislative enactments that showed the public interest in the particular area, for example, in the medical field. But in addition to the public interest, which is part of the analysis, this is not the situation you set up is just a one-to-one situation. It's just a – there's no gatekeeper type of situation here where people are prevented from dealing with others. Again, one of the examples, to get back Ms. Tice together, is paragraph 23 of the complaint, and there are others, talks about the effect on brokers and the fact that they won't hire appraisers if they know that they may be dealing with Wells Fargo. And as I sit down, I will look for the others, Your Honor. There are others. But that's the point, that this affects, the effect in this case goes beyond the dealings between the defendants and the appraisal companies. In Your Honor's hypothetical, it does not go beyond that. It's deals between them. It's not going to affect anybody else's dealings. In addition, although Your Honor is correct that an appraiser has to be licensed in a particular State, if these appraisers went to any other State, they would be subject to the same restrictions by Wells Fargo because this is a national database and they wouldn't be approved. So they are really limited here. They can't even think, well, you know what, I can't do it in my community. I'll go someplace else. I'll get licensed and I'll be okay. If, well, if they're going someplace that Wells Fargo has substantial power, they're going to be harmed there as well. So this decision is rather decent. But you have any privilege that Wells Fargo has substantial power in the places where they're operating? I understand that, Your Honor, and that's why I'm saying we have not specifically alleged to specific geographical areas. Kagan. Tell me why you think that this was – you seem to think that the district court opinion has – was on some other basis than the basis we've been discussing here. And why was that? I mean, it seems to me that Judge Wilkins said essentially what we've been asking you, i.e., where have you demonstrated that there was any substantial power? The court did talk about that. But the court also said this is just a decision by a company not to do it. Ultimately, it is, because you haven't alleged that it's anything else. In other words, ultimately, if you can't allege that there's – or you haven't alleged that there was some particular degree of control over the market, then all you've got is somebody who won't deal with somebody else. The district court said, No authority requires the imposition of the Fair Procedure Doctrine simply because removal from a single company's list of appraisers it chooses to retain substantially affects the economic interest of the removed appraiser. And it goes on. And the court just on the one chance – I mean, the law in the Ninth Circuit has been that we give opportunities to amend, and the court didn't hold oral argument. Did you ask for it? We weren't at oral argument. Did you move to amend? No. I mean, you can't fault the court when they don't know what you want to do, can you? I assume you have a right to amend it, but usually, at least when I was a district court judge, I didn't grant it unless somebody asked for it. Well, normally, my experience is that courts, if they want to give you an opportunity to say, they will say without prejudice, but this Court dismissed with prejudice. You said that there was no oral argument? Correct. For the district court? Correct. So it was just on the papers? Correct. I see. There was oral argument on the first complaint. I want to make sure I don't mislead anybody, but the claim was not in there. There was no oral argument. You didn't argue with – did you argue before us that you wanted to have an amendment? I'm sorry? Did you argue in your briefs here that you wanted an amendment to the complaint? I will have to look back. I know we said in various parts about the California – yes, we did say we would ask for leave to amend if the court – All right. Your time is up. Yes. On rebuttal, it would be helpful to me at least, even though it's not really a rebuttal, to have some explication of why California law applies here anyway. I'm having a hard time with that. Thank you very much. Okay. We're going to take a break, please, and we will be back in a little while. Thank you very much. All rise. Please stand and be seated. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you.  Thank you. Our apologies. Go ahead. Thank you. May it please the Court. My name is Elizabeth Farrick and I represent the appraisal management company, Arrell Evaluation. The sole issue before this Court is whether a plaintiff stated a claim for violation of California's common law fair procedures doctrine. And as the district court answered, the answer is no. After two bites of the proverbial apple, the plaintiff simply failed to state a claim. Well, in fact, there was only one with regard to this cause of action, right? Yes. But they were It wasn't the ordinary thing to do, to be grant leave to amend? Well, I think an amendment in this case would have been futile. I think the district court Well, maybe that's true if you know the facts. But from the face of things, I mean, it is possible. I mean, the structure of the situation isn't that different from that of some of the other cases. And if, in fact, it turned out that in Colorado, if you don't – if you're not on Wells Fargo's list, you can't be an appraiser as a practical matter or you can't – or you can't have access to 80 percent of the market, why wouldn't that state a claim? I think applying the fair procedures doctrine to this case would be extending the reach of that doctrine far beyond its previous judicially created scope. And the California Supreme Court and the Marinship and Pinsker, Ezekiel, Popvin line of cases, they clearly delimited clear limits on the application of this doctrine. And when you look at that line of cases, they set forth a two-prong analysis. And the first inquiry asked, really, whether the defendant is a gatekeeper. And in answer to that question, there's no support in the law to hold that Wells Fargo, or particularly Rells, is a gatekeeper that wields any sort of power or authority to impair the plaintiff's ability to pursue a profession as an appraiser. Why are the closest instead of cases the PPO cases, the cases about doctor panels? Certainly, like the Supreme Court case of Popvin, I think, is the closest. But there's a critical difference in the Popvin case. There are several critical differences. But there's a critical difference in the Popvin case from our case. And in Popvin, the plaintiffs allege two things. One, here plaintiffs are just alleging that they cannot do appraisals for Wells Fargo's loan. There are no third parties involved. In Popvin they claim there are third parties involved. Well, they claim that their gatekeeper theory would apply to any three-way relationship. And you could be connecting nannies to families. That's a highly regular relationship. But they're also complaining, although I'm not sure it's in the complaint, that not only can't they work for Wells Fargo, but they can't work for anybody that they will be they're saying this, I don't think it's in the complaint, that they may be boycotted by mortgage brokers in case they, because many of them might, as I understand it, go shopping around the mortgage. And if Wells Fargo won't bid, then they're disadvantaged. And so they're going to be boycotted by a large group of people. I think that, one, you're absolutely correct, that's not in the plaintiff paragraph, that the plaintiff cited to paragraph 23 actually says that plaintiffs work for a large group of mortgage brokers and that this is a very diverse and competitive industry, as is the appraisal service industry. So it's not in the complaint. And I don't, but I don't think even if it was that it fundamentally changes this. All that they allege here is they can't do appraisals for Wells Fargo's loans. They don't allege anything else. In Potvin, the plaintiff specifically alleged that he had been rejected from other physician groups because they, he didn't have the credential of being on the preferred provider list. Here, Wells Fargo and Wells, they, all Wells does is sign a contract with an appraiser that says they provide field appraisers. They're not, it's no sort of credentialing. There's no sort of licensing. There's nothing that makes them any sort of gatekeeper of this mortgage industry. Plaintiffs haven't alleged and can't allege even that right now they still can't work for Wells on other lenders' loans. There's simply no gatekeeper function here, unlike the, the PPO status that is provided in Potvin and, and the. Do you know, do you know whether the plaintiffs in fact have worked for Wells on other matters since this incident? I do not know. I know that they, of course, have continued in their appraisal capacity, but I don't know if they have closed loans for RELS. What, what kind of, RELS has relationships with other banks besides Wells Fargo? Yes. With other, yes. There's other people that can place, you know, the orders through, through RELS to close loans. I thought the way the plaintiffs had set up RELS was basically a, a subset of Wells Fargo. That's wrong. Well, they, they have a, they do a lot of work with, with Wells Fargo, yes. Not that they were set up as a sort of subsidiary of Wells Fargo. No. And I, and Mr. Brown could probably more effectively discuss this, but my understanding is that Wells Fargo works with many other appraisal management companies as well. And I think an important thing to note in this case is that, unlike in the PPO cases, it's the credentialing issue. You know, RELS contracts with these appraisers, but this is not a, a published list. It, it doesn't go out. It's not disseminated. It's not given to competitors in the industry. It's, it's, it's not like if Wells Fargo says okay or RELS says okay, you're not on the Wells Fargo approved list. It's, it's not like that is used against these appraisers in another context. And so when, when Mr. Spiegel is talking about the, the mortgage brokers going to shop these loans, I'm not sure that, I'm not sure that exactly is a plausible scenario that I'm not sure that how the mortgage brokers would ever know, for instance, that this particular appraiser isn't on the Wells Fargo approved list. The process goes something like this. The appraiser would contact, I'm sorry, the lender or mortgage broker would contact RELS, which serves as a go-between. And RELS, in a previous step, has already contracted with these appraisers and, you And so I don't know if practically that that would really ever play out. But I do think it's important to note that in Popvin and the other PPO cases that there are some significant differences that relate to a party's ability to do business with other third parties that don't exist in this context. Kagan. Kagan. The choice of law question. Do you want to briefly address that? Yes. I think that particularly when you look at RELS's, the involvement of my client RELS in this case, that there is no reason to apply California fair procedures to a company that does business in Minnesota where the decision-making process is done in Minnesota and neither of the plaintiffs are licensed as appraisers or alleged that they do any sort of appraisal business in California. And Does RELS operate in California? At the time, I do not believe that RELS operated in California. RELS is now licensed in California. But at the time, I do not believe they did. I don't want to eat too much of Mr. Brown's time. I have one further question. Usually Judge Wilkins is very careful, and I'm a little concerned about the dismissal with prejudice. And the question comes up, during the discussion and the argument, which I assume took place before Judge Wilkins, was the idea of the gatekeeper analysis discussed? There was no argument on this amended complaint in front of Judge Wilkins. But there was extensive briefing on it. Okay. Was the gatekeeper issue come up? Yes, it came up. And she, in her opinion, actually correctly cites the precedent that we discussed and recognizes that the company would have, the defendants would have to serve in a gatekeeper function and that mere economic loss, which is all plaintiffs have alleged here, is not enough under the current bounds. But that leads to the conclusion that they should have the right to amend. Because they are in some sense claiming otherwise, and they also are claiming that they could allege more with regard to the market impact and so on than they have. Plaintiffs didn't ask for leave to amend below, didn't ask this Court for leave. But isn't the standard rule that you, that dismissal is leave to amend, absent some, if there isn't a reason not to? Well, we are talking about the First Amendment complaint. So they had tried to state, like, five or six causes of action and had failed. But with that said, as I started out this argument, I do think an amendment would be futile here, because the ---- But that's not the question we asked. We asked the question of whether or not there was warning for the plaintiffs so they would ask for an opportunity to amend. And that's why I asked whether the gatekeeper issue was being discussed in the written briefs. Yes, it was. Yes, Your Honor.  That answers my question. Thank you. Thank you. May it please the Court. Brooks Brown on behalf of Wells Fargo. I think I argued the first, I think to answer your question, Judge Wells, I argued the first motion to dismiss against Mr. Spiegel, there was no discussion that the new complaint would allege a complete change in theory from RICO and intentional interference with respect to economic advantage to this new common law of fair duty claim. I think the ---- What's the relevance of that? I was trying to answer the judge's question, because I was arguing ---- I thought the judge's question was whether the, once this was put in the complaint, whether there was any discussion such that there would have been a reason specifically to ask for leave to amend rather than to expect that the usual leave to amend rule would apply. I think my experience, Your Honor, is I can't speak for why the plaintiffs don't. In most cases, I see the plaintiffs will, as part of their last argument in a brief, they'll typically say, if you don't think this is enough, we'll allege more and we'd like an opportunity for leave to amend. That didn't happen here. They didn't allege, in fact, when they brought the case to this Court, that there was any error in failing to get leave to amend. And I think the other thing that's important to point out, between the two cases, Your Honor, this is not the first time the plaintiffs were given an opportunity to replete with respect to their economic interests and their relationships in the marketplace. This is a situation where they had alleged some of those same things in the first complaint. So they were really on their second bite on the apple on those types of questions. I think I also want to speak to a little bit of the public interest question that Your Honor asked. The reality here is I think Mr. Spiegel is suggesting that merely if you're in a regulated industry, that means there's a public interest. But I think if you really get behind the cases, the question is not really whether appraisals or loans or the like are in the public interest. The question is whether the defendants operate in a quasi-public interest role with respect to the appraisal profession. So when you look at the medical cases ---- Well, how did the union cases get into that? Those were private employment relationships. Those were private employment where people are completely ---- In the shipping industry. I'm sorry? In the shipping industry. I understand those cases. I was speaking more to the medical industry cases. Okay, fine. But the union cases, Your Honor, I think do not. Those are cases where people were simply foreclosed from the ability to work in the shipping cases as a result of the defendants' closed-end union jobs. It wasn't clear from the cases whether they were foreclosed from working in the shipping industry or they were foreclosed from working for the particular employers. Well, I think that my sense of it is that the union had the complete labor market when you look at the series of cases over time. They supplied the entire labor market. I mean, that still means that the public interest theory that you're propounding doesn't seem to be necessary. I think it means what I'm saying is the public interest here, the cases that are applying the public interest are vastly different. They're – that's – those are cases generally in the medical field where they're talking about situations where there are fiduciary – Okay. But if he's saying – but the union cases are still there. They've never been overruled, and they don't seem to have any component like that. Yeah. So the question is why – if he were to come back and – I mean, this is a bunch of hypotheticals, which I'm sure don't exist. Sure. But if he was to come back and say, I'm just like those people in the union cases. I cannot work as a – as a practical matter, I cannot work as an appraiser in Colorado because not only does Wells Fargo have 80 percent of the market – and I'm making this all up – Sure. But with regard to the other 20 percent, it's all the same mortgage brokers, and they're not going to work with somebody if they can't shop at Wells Fargo, so I'm not going to have any work. I don't think he can come back and say that because actually – I'm assuming he can't say that. No, I'm not even saying as a – Good. What is the public interest thing? I'm saying as a – as a legal matter, I don't think he can come back and say that because he's actually alleged the opposite already in this case. He's saying I had lots of relationships with lots of lenders. I haven't lost all of my business. I lost some smaller percentage of it. This isn't a complete foreclosure case. They've never alleged it that way, nor could they, because they'd be alleging facts that are wholly 180 degrees opposite of what they've actually already alleged. So he's basically saying that the case law says you either have to have the public interest and some large percentage of foreclosure or no public interest and a greater degree of foreclosure. And a greater degree of – Foreclosure from the market. I think that it's not a question of the degree of foreclosure of the market. I think none of the cases, what they hang their hat on in their reply brief is it's a loss of my economic interest. Well, that's true exactly in Justice Bybee's Xerox example. That's not enough. And if you look at the Yarry case, the Connecticut general case, and the Potvan case, they all say mere loss of income is not enough. If you look at all the cases, there's not one that simply comes out and says, oh, I lost some income, therefore I win. And even Potvan says mere loss of income, and I'm quoting, would not be conclusive proof that removal from the list will generally reduce the provider's income so significantly as to impair the ability to practice her profession. The key issue that they're looking at economics from, that you take away from these cases, is that they are looking to see whether the economic loss affects a proof, essentially, that you are foreclosed practically from practicing your profession. Well, Potvan wasn't really that. Well, Potvan, sure. But Potvan, it has more of a fiduciary role there because you have a situation where the association is holding out to the public that these people meet certain credentialing requirements. And I think the cases do divide between this kind of licensing or credentialing. I thought that was the PPN case. I may have the case wrong. Well, I'm in the PPN case, whichever one it is. I thought that was the PPN case. This is the doctor removed from the preferred provider list. Correct. And I think what it actually says, it does not, that court goes out of its way, the Supreme Court, duty does not apply to every removal from a preferred provider list, and that's where we are. But it did apply there, even though it wasn't anywhere near, it was a huge percentage of the market. Well, it applied there in a situation where you were, the evidence was much more, there was, and I'll give you the key facts, there was, the evidence was of a devastation of the doctor's practice, not a mere loss of economics. They were required to report that removal to others that actually then took their licensure and credentialing away, the doctor was. He was removed from others' lists as a result of that. He was rejected by professional groups. And it's all of that set of facts that the courts added up, not just the economic loss, but it's that complete universe of facts that adds up to conclude that the taking off of the provider list was an effective bar, it was a practical bar to his ability to practice. Yes. I gather Wells Fargo does not, for its own purposes, claiming that California law doesn't apply. I think, Your Honor, I think we have joined in Rouse's brief, and I would certainly think, and although the case wasn't out at this time, after Sullivan v. Oracle, decided by the California Supreme Court in, I believe, June, I actually think there would be a very good argument that that would apply to Wells Fargo. That case, in my view, makes clear that it's not just the abstract policy decision-making that you have to look at, and this is, understandably, it's a UCL claim, but I think the analogy applies to what we're talking about here. It's, you have to look and see where is the injury and where is the injury producing conduct. And if you look at those things here, the injury producing conduct is actually the removal from Rouse's list, Rouse isn't in California, and the injury that results from that occurs locally. These are not California plaintiffs. They don't claim that they did anything in California. And in Sullivan, the worker, I'm sorry. They claim that you, Wells Fargo, did things in California. They claim essentially what happened in Sullivan is that I am headquartered here, and that I made some general policy decisions. And those abstract general policy decisions after Sullivan or after Oracle are not enough, because that's exactly what happened in Sullivan and Oracle. The question was, the theory there was that Oracle from its headquarters here in California was going to pay $1,000 people for wage and hour purposes. And the court said, that may be so, but it's until that has an impact on the person, that is, you apply that classification to them, and you deny them wages based on that classification, it's where does that decision, not the higher up decision. Because the higher up decision, standing alone in and of itself, doesn't result in any unlawful conduct. Thank you. Thank you very much. We will give you a minute or so in rebuttal. Just five seconds on the economic power. I very much disagree with the readings of the cases about we have to allege that there is essentially an end to the professional work of these individuals. That's just not what the PPN recent cases say. On the choice of law, this is not like Sullivan versus Oracle. There was not simply an abstract, generalized policy stated, and then it was implemented separately elsewhere. There is an ongoing maintenance of a database at the direction of Wells Fargo, at their headquarters in California. For example, when Mr. Pearsall, as we allege in the complaint, was called, after he was removed from the list, he was called by somebody from Wells Fargo for business, and he said, I thought I couldn't be called. That individual went back, went to a database, came back, said, you're right, shouldn't have done it. This is not discrete decisions in discrete locations. This is a process set in play and maintained by Wells Fargo and RELS with the maintenance of this national database, which is exactly why nobody, no appraiser who is off the list could go to another State even and do work for Wells Fargo, because it wasn't just a decision by a local person in Colorado or a local person in Washington that only had ramifications in that local area. Roberts. Counsel, one question going back to the question of filing an amended complaint. I understand you did not request the district court do that. Did you, as you were sitting at the table, did you brief that in this court? No, we did not on that specific issue of the power. Now, if I may, I'm sorry. Even if you had briefed that in this court, what would be the standard of review? Is it abuse of discretion? So within the district court's discretion whether to grant leave to file an amended complaint? Yes, abuse of discretion. It would have to be abuse of discretion if you had briefed it properly enough and not forfeited it. Yes, but here's the point. If Your Honor will look in the last paragraph of the district court's decision, the court specifically said that an amendment would be futile. Did you raise that issue in your brief, your opening brief? Not here. No, we did not, Your Honor. You understand if you don't raise it there, it's waived here. Well, but I believe that there are cases in this court where the court has said that, look, it's just, it is part of, it's almost so integral to everything that if this court thinks that there should be. I understand. I understand your point, Your Honor. And the factual matter is no, we did not state it in our opening brief. But the district court did specifically say it would be futile. That puts us in a position of saying it's hard to go back to a district court at that point. Is it okay? You've given your final word. We respect it. We'll move on. Well, that may be. But if you didn't raise it with us, it was a different problem.  Thank you very much. Thank both of you for your arguments. Thank you. The case of sound appraisal v. Wells Fargo Bank is submitted and we are at recess for the day. Thank you very much. J. Bobby Rumsfeld is going to trial.      Okay, where? Whenever you're writing your torture memos. J. Bobby is a war criminal. You are next. Okay, where? Whenever you're writing your torture memos. J. Bobby Rumsfeld is no legitimacy sitting on the court. Law. And you all have the obligation to defer him to impeachment. Shame on all of you. And all of you should refuse to practice the committment. He is a war criminal. Hi. Good. How are you?    Good. How are you? Good. How are you? Good. Good. Great. Good job. Nice to see you again. Nice to see you. Thank you. Thank you. Microphone. Just right by you. Okay. Thank you. Good to see you. Good to see you. Good luck. Thank you.    Good luck. Thank you all. Thank you. You've already got it. Look at you. Look like you got it. Yeah. No, I don't have to get ready for you and run around. Okay. No, I got it. Okay. Oh. That's it. Let go. Okay. Yeah. Yeah. Take pictures. Thank you very much. I know. I saw that. Yeah. Whoops. No. Yeah. Is this the water they imported from, uh, from Augusta? I don't know. I don't know. It's just a tap water. It's a gentler water.       Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. I don't think this is cold. I think we have it too deep for that. I don't know. I'm not sure. It is a big pond, too. Yeah, I know. I, I, I think I have it in here now. Yeah. I'll tell the court room three is good. All right. All right. I'll see you now. Okay. Bye.   Bye, Mike. Thanks for visiting. We'll send you a copy. Bye. Bye. Bye. Bye. Bye. Bye. Bye. Bye. Bye. Bye. Bye. Bye.
judges: Wallace, Berzon, Bybee